### Application of ORSINI.
### Patent Appeal No. 5251.

Court of Customs and Patent Appeals.
Dec. 9, 1946.

———◆———

Barry & Cyr, of Washington, D. C. (Robert E. Barry, of Washington, D. C., of counsel), for appellant.

W. W. Cochran, of Washington, D. C., for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the Primary Examiner's rejection of all the claims, numbered 5 to 9, inclusive, of appellant's application for patent for a process of manufacturing bricks, blocks, and like building elements.

At the hearing before us counsel for appellant moved to dismiss the appeal as to claims 5, 6, and 9, which motion will be granted. This leaves to be considered only claims 7 and 8 which read:

"7. Process of manufacturing bricks, blocks and like building elements, comprising crushing limestone into grains or chips, sifting the grains or chips through several sets of sieves of different widths of meshes, selecting larger or smaller fractions of the sifted grains or chips and admixing them with a Portland cement sludge in such proportion as to obtain a non-flowable mixture in which the grains or chips are coated with a cement film, one-third at least of the said chips being between 4 and 10 mm. in diameter, moulding such mixture under pressure at atmospheric temperature, de-moulding the bricks while still wet and allowing the de-moulded bricks to dry and harden.

"8. Process as claimed in Claim 7, wherein the crushed limestone is sifted through sieves of 10 mms., 4 mms., and 3 mms. widths of meshes; the fractions retained by the 4 mms. sieve and passing through the 3 mms. sieve are selected and mixed in a proportion of two parts of the latter for one part of the former; to which mixture of grains or chips is added 80 Kgs. of Portland cement for each cubic metre of grains or chips and such quantity of water as to obtain a viscous, non-flowable mixture."

In the brief for appellant before us there is a summarization of the alleged invention reading:

"Recapitulating, it will be observed, in accordance with applicant's process, limestone is crushed to produce two fractions, the first consisting of relatively large grains or chips which will pass through a sieve of 10 mms. width of mesh, but not through a sieve of 4 mms. mesh, and a second fraction of relatively small particles or powder capable of passing through a sieve of 3 mms. width of mesh. One part of the course chips or grains is mixed with two parts of the finer powder and then this mixture is admixed with the Portland cement and water; after which the material is moulded, de-moulded, dried and hardened."

Calculations furnished the court by counsel for appellant during the presentation of the case before us gave the English equiv-

alents of the metric terms used in the claims and in the briefs as: 3mms. = 0.12 in.; 4 mms. = 0.16 in.; 10 mms. = 0.4 in.; and 80 Kgs. per cu. metre = 135 lbs. per cu. yard.

So, expressing the terms in the English standards of measurement and weight, claim 7 requires that at least one-third of the crushed limestone shall be between one-sixth of an inch and two-fifths of an inch in diameter and claim 8 requires that one-third of the crushed limestone shall be of that size and that the remaining two-thirds shall be less than one-eighth of an inch in diameter. Also, claim 8 provides that after the mixture of the defined sizes is made, one hundred and thirty-five pounds of Portland cement shall be added for each cubic yard of the mixture.

The claims seem to have been finally rejected by the examiner as presenting nothing patentable over the disclosures of a patent, No. 829,012, issued to Wm. E. Jaques, August 21, 1906, taken with the publication "Cement and Concrete," by one Sabin, paragraph 295, at page 187. The brief of the Solicitor for the Patent Office indicates that the latter publication appeared in 1905. Subsequent to the appeal to the board and in his statement on the appeal the examiner added (and the board considered), as a reference, a reissue patent to Wallace Clement Sabine et al., dated November 23, 1920.

The decision of the board is brief, being substantially a paraphrase of that of the examiner with the specific declaration: "* * * We are inclined to agree with the Examiner that the claims do not define a patentable invention for the reasons fully stated by the Examiner in his Statement."

The Jaques patent is for improvements in the art of making cementitious products or artificial stone, and the claims, like those of appellant in the instant case, are all method claims. The examiner said of appellant's process:

"His procedure is the conventional manner of molding wherein the three ingredients are mixed in such proportion that the resulting concrete is harsh and nonflowable i.e. with a zero slump. The mix being then placed in a mold, compressed into bricks, immediately removed from the mold and put in a warm atmosphere to set and cure."

After so stating, the examiner continued:

"The procedure followed by Jaques is similar in every respect. First he mixes the aggregate (which may be ground rock or sand) with a cement and water slurry to coat the individual grains of aggregate. He then molds the mix by compressing it into a mold. Finally the molded block is removed from the mold 'while still wet' and put in a convenient place to harden."

A somewhat more detailed description of the Jaques method, based upon the specification and drawings of the patent, are given in the brief of the Solicitor for the Patent Office as follows (record page references omitted):

"According to the method cement and water are first mixed to form a slurry which is then added to sand or ground rock material or any other similar material * * *. After the materials are thoroughly mixed the mixture is placed in the hollow column A and tamped. Since the column is rather high the portion of the material at the bottom thereof will be under pressure due to the weight of the material above. This pressure, while not given in the patent, is said to be sufficient to compact the particles into such juxtaposition [sic] to each other as to form a mass which is practically nonporous * * *.

"By means of the structure shown near the bottom of Figs. 1 and 2 of the patent, the lowermost portion of the mixture in column A may be pushed out to the side, in the form of a block resting on the pallet 14. The still wet block and pallet are then removed to some convenient place and left to harden * * *. The temperature of hardening is not given and it may be assumed to be ordinary atmospheric temperature.

"From what has been said it appears that the method of Jaques is generally similar to that claimed by appellant. Jaques uses crushed stone for the aggregate, mixes it with cement slurry, molds the mass under pressure into blocks, and removes the blocks from the molds while still wet and allows the blocks to dry and harden."

It does not seem to be contended on behalf of appellant that there is any substantial or patentable difference, so far as actual steps are concerned, between his method and that disclosed in the Jaques patent, but, as we understand it, it was and is claimed that invention lies in the use of limestone; particularly in the gradation or sizing of the limestone chips or particles.

The examiner and the board took the view that Jaques "ground rock" could be limestone, and there was also cited the "Cement and Concrete" article, paragraph 295, of which reads:

"295. Presence of Screenings in Broken Stone.—It is frequently required that the broken stone shall be freed from all fine material, resulting from the crushing of the stone, before the mortar is added to form concrete. The wisdom of this requirement is not always clear and depends upon the kind of stone. It has already been stated that some forms of crusher dust or screenings give, if not too fine, most excellent results in mortar; *this is especially true of limestone screenings.* Again, to retain in the broken stone all of the screenings, will result in diminishing the percentage of voids in the aggregate, and thus decrease the amount of mortar necessary." (Italics supplied.)

With respect to the graduated sizes of the grains the examiner did not regard the range of from 3 to 10 mms. (about ⅛ to ⅖ of an inch) as being "patentably critical."

In discussing that phase of the controversy the examiner pointed out that the Sabine et al. reissue patent, which relates to sound absorbing material for walls and ceilings, "discloses the use of grains of substantially uniform size in order to produce a block having a high percentage of voids, the grains just passing through a sieve about 12 meshes to the inch, or about 2 mm. in diameter," and also quotes from the "Cement and Concrete" publication, supra, the last clause reading, " * * * to retain in the broken stone all of the screenings, will result in diminishing the percentage of voids in the aggregate, and thus decrease the amount of mortar necessary."

We are not persuaded that the board erred in affirming the decision of the examiner.

As has been indicated, the steps taken in appellant's operation do not differ materially from the steps shown in the Jaques patent. So far as the kind of material is concerned, it is true that Jaques does not mention limestone, eo nomine, but surely limestone is embraced within the common meaning of "rock material." The first definition of limestone given in Webster's New International Dictionary is "1. A rock consisting chiefly of calcium carbonate and yielding lime when burned." The Sabin article, of course, is specific to the use of *limestone screenings* used in the concrete industry, but defines no particular size or sizes. It is indicated that they should not be too fine. Appellant's smallest screening is 3 mms. (about ⅛ inch) in diameter. It was claimed in the argument before us that by the use of the different sizes of chips or particles, defined in the claims, the voids in the aggregate of the block are filled, so that less Portland cement is required than otherwise would be required. Assuming that to be true, it does not lend patentability to the claims for the reason that the selection and commingling of different sizes of rock in making concrete blocks is old in the art, as illustrated by the Sabin article and obviously smaller chips or grains will fill the voids between larger pieces.

We are not convinced that the particular sizes of the chips or the particular quantity of the Portland cement defined in the claims are critical.

The appeal is dismissed as to claims 5, 6, and 9 and the decision of the Board of Appeals is affirmed as to claims 7 and 8.

Affirmed.